# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8187 | **DATE** | 1/12/2005 |
| **CASE TITLE** | Linda Hoffman vs. Jo Anne B. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The case is remanded to the ALJ for further proceedings consistent with this opinion. On remand, the ALJ should reevaluate Hoffman's complaints of debilitating migraine pain and the effect, it has, if any, on the ALJ's physical and mental RFC determinations. The ALJ should also elaborate on her RFC assessments and explain why Hoffman is capable of performing full-time light work despite her migraines and other impairments.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | 2 | **Document** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | **Number** |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | JAN 1 3 2005 | |
| | Notified counsel by telephone. | | | date docketed | 29 |
| | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 1/12/2005 | |
| | | 2005 JAN 12 PM 4:22 | | date mailed notice | |
| ETV | courtroom deputy's initials | | | ETV | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LINDA HOFFMAN,                              )
                                            )
              Plaintiff,                     )
                                            )
       v.                                   )     No. 02 C 8187
                                            )
JO ANNE B. BARNHART, COMMISSIONER           )     Judge Rebecca R. Pallmeyer
OF SOCIAL SECURITY,                         )
                                            )
              Defendant.                     )

DOCKETED
JAN 1 3 2005

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda Hoffman claims that she is disabled by a combination of impairments, including migraine headaches, back pain, abdominal problems, and depression. She filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 423(d) and 1381a. The parties have filed cross-motions for summary judgment. For the reasons set forth here, the case is remanded to the ALJ for further evaluation.

## PROCEDURAL HISTORY

Hoffman applied for DIB and SSI on April 10, 1998, claiming that she became disabled on January 26, 1998 due to ovarian cysts, abdominal pain, gastric ulcers, and an enlarged colon and intestines. (R. 99-101, 108.) The application was denied on May 18, 1998. (R. 63.) Hoffman did not file a request for reconsideration but instead submitted another application for DIB and SSI on August 12, 1999, this time claiming that she became disabled on February 9, 1998 due to dizziness, blackouts, double vision, anxiety, stress, shakiness, and neck and back pain. (R. 102-04, 138.) The application was denied initially and again on reconsideration. (R. 64-65, 70-73, 75-77.) Hoffman appealed the decision and requested an administrative hearing, which was held on September 8, 2000. (R. 21, 78.)

29

On November 30, 2001, the Administrative Law Judge ("ALJ") denied Hoffman's claim for benefits. The ALJ found that Hoffman suffers from a history of migraine headaches, tension headaches, ovarian cysts, and endometriosis, as well as degenerative disk disease and depression, all of which are severe impairments under the Social Security Regulations. (R. 24.) The ALJ concluded that Hoffman nonetheless retains the functional capacity to perform light, unskilled work. (R. 25, 26.) On July 15, 2002, the Appeals Council denied Hoffman's request for review. (R. 13-14, 17.) Hoffman now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Hoffman was born on November 14, 1964 and was 35 years old at the time of the hearing before the ALJ. (R. 34.) She is a high school graduate who lives with her boyfriend and has no children. (Id.) Hoffman has worked as a front-end supervisor for a grocery store, and as a waitress, hostess, cashier, auto parts delivery person, night supervisor, sandwich maker, and cook for various other establishments. (R. 35-38, 40.) She last worked in February 1998 as a waitress and hostess. (R. 35.)

A.    **Medical History**

1.    **Back Pain**

In February 1991, Hoffman injured her back at work and was diagnosed with a herniated disk. She underwent treatment for the condition until approximately June 1992. (R. 213-24.) The record indicates that Hoffman did not seek further medical assistance for her back or for any other condition until April 1997 when she began seeing internist Dr. Lubna Maruf for back pain. (R. 402-03.) Dr. Maruf prescribed Relafen, Vicodin, and Flexeril for Hoffman's back pain, and by April 23,

2

1997, her condition was "much improved."[1]  (R. 402.)  Dr. Maruf also referred Hoffman to a neurologist. (*Id.*)  A November 19, 1997 X-ray of Hoffman's lumbosacral spine, however, showed "[n]o significant findings."  (R. 406.)

On January 2, 1998, Hoffman went to treating physician Dr. Pedro G. Palu-Ay, an emergency medicine and family practice specialist, complaining of neck and low back pain.  (R. 394.)  Two weeks later on January 17, 1998, Hoffman went to the emergency room at Victory Memorial Hospital ("VMH") and reported that she had fallen and injured her back the previous day. According to the attending physician, Hoffman did not receive any treatment at that time because she said she had to go to work.  (R. 258.)  Four days later on January 21, 1998, Hoffman went back to the VMH emergency room complaining of a cold and lower back pain from her fall.  (R. 260.)  Hoffman saw Dr. Palu-Ay on February 17, February 27, and June 6, 1998 for continuing back pain, and he diagnosed her with "Cervical and Lu[m]bar Disc Syndrome."  (R. 383, 392-93.)

Hoffman next sought treatment for her back pain at the VMH emergency room on January 2, 1999.  (R. 285.)  The attending physician noted that Hoffman had "frequent ER visits for pain med[ication] and Soma," a muscle relaxant; that she had "walked out in the past after receiving . . . narcotics"; that there was "[s]uspected drug seeking behavior"; that she was "[r]equesting Soma by name"; and that she "[c]laims to be unable to reach [her doctor] for refill." (R. 286.)  The attending physician talked to Hoffman about the "<u>appearance</u> of drug seeking behavior" and stated that he was "uncomfortable giving her any drugs of abuse."  (*Id.*) (emphasis in original).  He discharged Hoffman with some Naprosyn (a form of the arthritis medication naproxen) for pain.  (*Id.*; http://www.rxlist.com/cgi/generic/naprox_ids.htm.)

---

[1]  Relafen is used to treat osteoarthritis and rheumatoid arthritis.  (*See* http://www.drugs.com/PDR/Relafen_Tablets.html.)  Vicodin is used to relieve moderate to severe pain.  (*See* http://www.drugs.com/vicodin.html.)  Flexeril is a muscle relaxant used to relieve pain, tenderness, and limitations of motion caused by muscle spasm.  (*See* http://www.drugs.com/flexeril.html.)

On January 18, 1999, Hoffman went to the emergency room again, this time at Northwest Community Hospital ("NCH"). She reported back pain from slipping and falling on the ice and was given prescriptions for Vicodin and Flexeril. (R. 299-303.) On January 28, 1999, Hoffman told her treating neurologist, Dr. Jeffrey S. Farbman, that she planned to see a chiropractor for her back problems. (R. 233.) One month later, on February 27, 1999, Hoffman called Dr. Farbman's office but he was unavailable. The progress notes recorded by someone in Dr. Farbman's office indicate that Hoffman "called in wanting narcotic medicines. She has chronic back problems and is on Relafen and Soma. She is also on Depakote[2] for unclear reasons. I told her that I am not comfortable prescribing narcotics for her after hours on the weekend. I suggested that she go to the emergency room." (R. 234.)

On April 3, 1999, Hoffman returned to the NCH emergency room complaining of back spasms and pain. She received prescriptions for naproxen, Flexeril, and Vicodin. (R. 306-10.) On November 19, 1999, Hoffman went to the VMH emergency room, again complaining of back pain radiating down her left leg. The hospital records indicate that the pain was "from an old accident," but it is not clear whether there was any further discussion of this issue. (R. 331-32.) The following month, on December 20, 1999, Hoffman underwent a cervical MRI which showed mild diffuse bulging of the intervertebral disk at C5-C6. (R. 374.) A December 21, 1999 lumbar spine MRI showed evidence of a small to moderate left forminal disc protrusion at L3-L4, and laminectomy defect on the right at L5-S1 with "[e]vidence of enhancing post-surgical scar ventral to the thecal sac at L5-S1 and some degree likely entrapping the right S1 nerve root which is minimally displaced posteriorly." (R. 372-73.)[3] The MRI also indicated that "[a] residual diffuse mild degenerative bulging disc at L5-S1 is present." (R. 373.)

---

[2]     Depakote is used to prevent migraine headaches. (See http://www.drugs.com/depakote.html.)

[3]     No indication of what surgery resulted in the scar appears in the record.

4

During a January 19, 2000 office visit with Dr. Farbman, Hoffman reported continuing back pain which she treated with Neurontin[4] and Soma as needed. Dr. Farbman noted that Hoffman "was initially asked to attend physical therapy, but did not. I have encouraged her to attend physical therapy and she has agreed to do so." (R. 239.) Shortly thereafter on February 8, 2000, Hoffman began seeing Dr. Mariusz Milejczyk, a general and family practice physician, for her back pain and migraines, in addition to Dr. Farbman and Dr. Palu-Ay. (R. 415.) There is no evidence in the record, however, that Hoffman ever attended physical therapy.

On March 23, 2000, Hoffman complained to Dr. Farbman of "one week of throbbing pain from the mid-back radiating down the left leg." Dr. Farbman ordered an EMG and MRI for this complaint. (R. 414.) Hoffman's April 6, 2000 MRI of the lumbar spine showed a small protrusion of the disc at L5 and L5-S1; moderate disc degeneration at L5 and S1; and degenerative arthritis of the facet joint[5] at L4-5 and L5-S1. (R. 409.) On April 14, 2000, Dr. Farbman reported that Hoffman continued to experience low back pain. He indicated that "[w]e will continue the present medicines [including Neurontin and Soma] and add Celebrex," an anti-inflammatory drug used to relieve osteoarthritis and rheumatoid arthritis pain. (R. 413; http://www.rxlist.com/cgi/generic/coxib_ids.htm.) On June 2, 2000, Dr. Milejczyk prescribed Vioxx, another medication used to manage osteoarthritis pain. (R. 417; http://www.rxlist.com/cgi/generic/ rofecox_ids.htm.) Most recently, a July 7, 2000 X-ray of the lumbosacral spine was normal. (R. 418.)

### 2. Stomach Pain

Hoffman first began complaining of abdominal pain on January 26, 1998 when she reported to the emergency room at Midwestern Regional Medical Center. She was given a prescription for

---

[4]     Neurontin, a seizure medication, is widely used to prevent migraines. (See http://www.drugs.com/neurontin.html.)

[5]     A "facet joint" is the joint between two adjacent vertebrae. (See http://www.mayoclinic.com/invoke.cfm?objectid=63DBF391-CE63-4C39-AFDCF267CA266.)

Darvocet[6] and instructed to get an ultrasound, which she did upon returning to the emergency room the following day. (R. 171-72, 272-73.) The test showed that the endometrium was "slightly prominent." (R. 175.) In addition, the right ovary had "small follicular cysts" and the left ovary was enlarged with a "slightly thickened wall lobulated cystic density" and "smaller cysts." (*Id.*) Hoffman was advised to continue taking any medication as directed and to follow up with Dr. Palu-Ay. (R. 173.)

Hoffman started seeing treating obstetrician/gynecologist Dr. Frank Sun for pelvic pain on February 3, 1998. (R. 205.) She had another ultrasound which again showed an enlarged left ovary but, according to Dr. Sun's notes, she did not receive any further treatment "[d]ue to lack of insurance and money." (*Id.*) Instead, Dr. Sun gave Hoffman a prescription for Tylenol #3 for pain. On February 5, 1998, Hoffman called Dr. Sun complaining that the Tylenol #3 was not helping her pain and he approved her request for Vicodin. Hoffman saw Dr. Sun once more on February 12, 1998. He refilled her Vicodin prescription at that time, and again at her request on February 16, 1998. (*Id.*) On February 25, 1998, Hoffman was dismissed as Dr. Sun's patient due to lack of money. The records indicate that Hoffman "w[ould] not be given any additional prescriptions for pain medication." (*Id.*)

On March 2, 1998, Hoffman reported to the VMH emergency room complaining of abdominal pain. She told the nurse that she had been scheduled for surgery that day but that the doctor had canceled the procedure.[7] (R. 177.) Upon examination, Hoffman's abdomen was soft and tender and her blood count showed some abnormalities. (R. 177-78.) The next day, Hoffman returned to VMH complaining of itching and nausea and was diagnosed with ovarian cysts. She

---

[6]     Darvocet is a narcotic analgesic used to control pain. (*See* http://www.drugs.com/darvocet.html.)

[7]     The records do not indicate the type of surgery scheduled, which physician purportedly scheduled it, or the basis for the cancellation.

told the doctor that her pain medication was not working and that her symptoms were caused by the Darvocet she was taking. (R. 180-81.) The physician noted "? Drug seeking" and "advised [he] would not prescribe narcotics - especially if nauseated." (R. 181.) Two days later, on March 5, 1998, Hoffman went to the Midwestern Regional Medical Center emergency room complaining of lower abdominal pain. (R. 281-82.) This time the physician diagnosed endometriosis. (R. 282, 391.)

Hoffman had an ultrasound on March 13, 1998 that was normal and showed "[n]o evidence of any ovarian cysts as seen on the prior outside ultrasound exam report dated 1/27/98." (R. 197.) Dr. Bonnie E. Wise, a gynecologist, performed a physical examination on Hoffman but it was limited due to discomfort and did not produce any notable results. (R. 200-01.) A few days later on March 19, 1998, Hoffman underwent an air contrast colon exam because of hardening of the stomach and bowels. The exam was normal. (R. 183.) Nevertheless, Hoffman went to the VMH emergency room on March 23, 1998 complaining of the same symptoms. (R. 185.) A March 26, 1998 air contrast upper gastrointestinal exam showed evidence of "a gastric ulcer in the antrum with some associated thickening of the folds in the antrum."[8] (R. 187.) The exam also showed evidence of duodenitis (inflammation of the first portion of the small intestine), and the physician, Dr. A. Saltiel, recommended further evaluation with endoscopy. (Id.; DORLAND'S, at 511.) Dr. Wise saw Hoffman again on March 27, 1998 and noted her abdomen was tender and softly diffuse. (R. 202.)

On March 29, 1998, Hoffman again reported to the VMH emergency room with lower abdominal and pelvic pain. (R. 188-89.) At the time, Hoffman was taking Ultram, Doxycycline, and

---

[8]        "Antrum" is a cavity or chamber. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (hereinafter "DORLAND'S") 101 (28th ed 1994).

Advil.[9] (R. 189.) The attending physician noted that Hoffman ambulated with difficulty and apparent discomfort, and diagnosed trichomonas – a parasitic infection – and chronic abdominal and pelvic pain. (*Id.*; DORLAND'S, at 1742.) The physician also noted: "suspect drug seeking behavior" and sent her for a drug screen. (*Id.*) The first screen tentatively detected barbiturates, but the confirmation test registered "negative" in that and all other categories. (R. 193-95.)

During a follow-up visit with Dr. Wise on April 14, 1998, Hoffman reported that she suffered from insomnia due to pain but that she had declined ibuprofen from another physician.[10] Dr. Wise made note of a "possible referral to pain clinic" for Hoffman. (R. 204.) On April 30, 1998, Hoffman had an ultrasound of the gallbladder, which was normal. (R. 284.) Two days later Dr. Palu-Ay completed a Bureau of Disability Determination Services form stating that Hoffman suffered from ovarian cysts and endometriosis, and was "unable to work at this time." (R. 208.) On June 23, 1998, Hoffman underwent an air contrast upper GI series exam which indicated "some thickening of the duodenal folds suggestive of some possible mild diffuse duodenitis." (R. 264.) An MRI of the cervical spine and an ultrasound of the pelvis performed on June 25, 1998 were both normal. (R. 225, 266.)

Hoffman did not make any further complaints of abdominal pain until August 14, 1999 when she again reported to the Midwest Regional Medical Center emergency room. (R. 314-15.) Abdominal X-rays were normal but a pelvic ultrasound showed what "appear[ed]" to be a cyst on the left ovary. (R. 318-19.) There are no records of Hoffman's abdominal problems after that date.

---

[9] Ultram is used to relieve moderate to moderately severe pain. (*See* http://www.drugs.com/ultram.html.) Doxycycline is an antibiotic. (*See* http://www.drugs.com/doxycycline.html.)

[10] The record does not indicate the identity of the physician or the date or reason Hoffman declined the ibuprofen.

### 3.    Headaches

Hoffman testified that she began having "a problem" with headaches in approximately February 1998. (R. 42.) It is not clear from the medical records when she first complained about the headaches, but she underwent an MRI of the brain on July 21, 1998, which was normal. (R. 226.) An EEG performed the next day due to Hoffman's complaints of dizzy spells, blackouts and migraine headaches was "abnormal," showing "spike-like waves appearing in the left posterior temporal region on occasion, asymmetrical theta and sharp activity arising in the occipital region." (R. 407.) The record indicates that the findings were "compatible with possible vascular or migraine type headaches and also with possible paroxysmal symptoms." (*Id.*)

One week later, on July 29, 1998, Hoffman saw Dr. Farbman and reported experiencing blackouts, diplopia (i.e., double vision), vertigo, fainting, and headaches, which she said began shortly after a car accident a year and a half earlier. (R. 227; DORLAND'S, at 475.) Hoffman described the headaches, which typically developed when she awoke from a fainting spell, as "sharp and pounding," lasting anywhere from one hour to all day. She also complained of photophobia, sonophobia, and nausea associated with the headaches. (*Id.*) At the time of the examination, Hoffman was taking Soma, Phrenilin, Claritin, and Depo-Provera shots.[11] (*Id.*) Dr. Farbman indicated that Hoffman's symptoms "appear[] most likely to be a combination of migraine with aura as well as common migraine." (R. 228.) He recommended that Hoffman begin prophylactic therapy with verapamil (a drug used to treat hypertension), and that she continue using Phrenilin "as an abortive agent," presumably meaning to help stop the migraines once they began. (*Id.*; http://www.drugs.com/Verapamil/.) Approximately one month later, on August 28, 1998, Hoffman called Dr. Farbman and reported that she could not tolerate the verapamil because it

---

[11]    Phrenilin is used to relieve tension headaches. (*See* http://www.drugs.com/PDR/Phrenilin_Tablets.html). Depo-Provera is a type of birth control. (*See* http://www.mayoclinic.com/invoke.cfm?objectid=05EB113B-8AD3-4C57-A1FE86BDA1F74619.)

made her blood pressure drop too low. She discontinued that medication but continued taking Phrenilin and Soma. (R. 230.)

Dr. Farbman saw Hoffman again on September 15, 1998 and noted that she was able to take a lower dosage of verapamil at that time. Hoffman reported no further episodes of loss of consciousness and stated that her tension headaches were being eased by Soma. She complained, however, of "nearly constant twitching of the left eye and mouth" since her car accident "approximately one and one-half years" earlier, and Dr. Farbman prescribed Klonopin to help control the spasms. Dr. Farbman instructed Hoffman to continue taking verapamil "with an eye toward eventually increasing it," and to follow-up with him in six weeks. (R. 231.) At her follow-up visit on October 26, 1998, Hoffman told Dr. Farbman that she only had two more episodes of loss of consciousness and was no longer taking Klonopin, but was otherwise doing well on the Depakote, Soma, and Calan (a brand name for verapamil). (*Id.*)

On November 30, 1998, Dr. Farbman noted that Hoffman's Depakote level was 36 and increased her dosage.[12] Hoffman reported no episodes of loss of consciousness but complained of "frequent" left eye twitching, and daily migraines, which were relieved with Soma. (R. 233.) Dr. Farbman referred Hoffman for an EEG "to be certain that [the] eye twitching is not a seizure." (*Id.*) The January 6, 1999 EEG was normal. (R. 288.) Hoffman saw Dr. Farbman again on January 28, 1999, and reported that she continued to have "some tension headaches." Dr. Farbman indicated that Hoffman's "[l]ast Depakote level on November 30, was 55"[13] and instructed her to start taking Relafen in addition to the Depakote. (R. 233.)

---

[12]     Hoffman testified at the hearing that her physician told her that her Depakote level should be over 50. (R. 60.)

[13]     The records reflect that Hoffman's Depakote level on November 30, 1998 was 36, not 55, but there is no explanation for this apparent discrepancy. (R. 233.)

Hoffman returned to Dr. Farbman on March 19, 1999, still complaining of daily headaches and left facial twitching, in addition to "a bit of left hand shaking." (R. 235.) Hoffman reported that the headaches were "somewhat better on Depakote" and that the Relafen helped "a little bit" but irritated her stomach. With respect to the twitching, she admitted to being noncompliant with her Klonopin prescription. Dr. Farbman referred Hoffman to a headache clinic and told her to continue taking Depakote and Soma. (Id.) On May 19, 1999, Hoffman had a therapeutic drug monitoring test which revealed that her Depakote level was low at 22.1. (R. 251.) Dr. Farbman attempted to reach Hoffman on June 9, 1999 to notify her of the test result but her telephone had been disconnected. (R. 235-36.)

On June 23, 1999, Hoffman saw Dr. Farbman and reported that she still had "constant headaches" but felt they were better than they had been in May. As of June 23, she was taking Depakote twice a day. (R. 236.) Her Depakote levels remained low, however, reading at 12.5 on June 24 and 13.3 on July 7, 1999. (R. 253-54.) On August 2, 1999, Hoffman told Dr. Farbman during an office visit that she continued to get headaches but was taking Depakote and Neurontin. She also stated that she was taking Soma "which helps her neck and back" pain. (R. 237.) Dr. Farbman referred Hoffman to Dr. Emmanuel Perakis, a psychiatrist, citing her complaints of "marked anxiety," which "appear[ed] to exacerbate the multiple complaints of headache." (Id.)

After examining Hoffman again on October 11, 1999, Dr. Farbman noted that Hoffman continued to take Depakote and Neurontin, but that her Depakote level remained subtherapeutic at 12.2. Hoffman told Dr. Farbman that she had been vomiting from Serzone, an antidepressant prescribed by Dr. Perakis on August 23, 1999. (R. 238; http://www.drugs.com/serzone.html.) Dr. Farbman instructed Hoffman to increase her Neurontin medication and to attend physical therapy to control her headaches. (Id.)

On December 29, 1999, Hoffman called Dr. Farbman complaining of slurred speech. After confirming that she had not taken any unusual or different medications, he told her to go to the

emergency room. (R. 238.) Hoffman went to the VMH emergency room on December 31, 1999 complaining of a headache associated with slurred speech, difficulty holding things in her left hand, difficulty concentrating, and neck pain. (R. 333-34.) She was admitted for observation, and the admitting physician found that her symptoms were consistent with severe migraine headaches. (R. 336.) A urinalysis drug test performed the same day indicated positive results for the presence of barbiturates, benzodiazepines, and opiates (both morphine and codeine). (R. 341-42.) Hoffman reported taking only Depakote, Neurontin, and Soma; the court presumes that report is inconsistent with the urinalysis results, but thee is no medical evidence on this issue. (R. 335.)

On January 19, 2000, Dr. Farbman saw Hoffman and noted her recent episode of slurred speech related to migraines. He encouraged Hoffman to continue taking Depakote, Neurontin, and Soma, and started her on aspirin "as a stroke prophylactic." (R. 239.) Hoffman's Depakote level at that time was 47. (*Id.*) As noted, Hoffman began seeing Dr. Milejczyk for migraines and back pain on February 8, 2000. (R. 415.) Dr. Milejczyk's notes are difficult to read but show that he saw Hoffman intermittently for several months for these conditions. (R. 415–17.) On April 14, 2000, Dr. Farbman indicated in a chart note that Hoffman was taking Depakote five times a day but that her Depakote level was only 0.7.[14] He noted that Hoffman's headaches continued and added Celebrex to her list of medications. (R. 413.)

### 4. Psychological Problems

During an appointment on June 23, 1999, Hoffman complained to Dr. Farbman of anxiety and he recommended that she see a psychiatrist. (R. 236.) Following Dr. Farbman's recommendation, Hoffman saw Dr. Perakis for a psychiatric evaluation on August 23, 1999. She complained of sleep disturbance, appetite irregularities, difficulties concentrating, decreased energy level, irritability, and low frustration tolerance. (R. 325.) She also admitted to abusing alcohol and

---

[14]     The court is uncertain whether such a marked decrease (from 47 to 0.7) in only three months is unusual.

cocaine in the past but claimed she had not used any such drugs for several years. Dr. Perakis diagnosed Hoffman with "Major Depression, single episode, moderate" and a "[h]istory of polysubstance abuse." (*Id.*) He referred Hoffman for therapy and gave her a prescription for the antidepressant Serzone. (R. 326.) On September 7, 1999, Hoffman returned to Dr. Perakis complaining of anxiety and sleep disturbance. She indicated that she was not sure she could proceed with therapy for financial reasons. (R. 328.)

On October 18, 1999, a non-examining state agency physician completed a Psychiatric Review Technique form ("PRT") based on Hoffman's affective disorder. (R. 349.) The examiner found that Hoffman suffered from sleep disturbance, decreased energy, difficulty concentrating or thinking, and some anxiety, as well as a depressive disorder. (R. 352.) The examiner noted a history of a substance addiction disorder but found no evidence of such a disorder at the time of the examination. (R. 355.) With respect to Hoffman's functional abilities, the examiner found that she had slight restrictions in her activities of daily living and slight difficulties in maintaining social functioning. In addition, she often had deficiencies in concentration, persistence, or pace. (R. 356.)

That same day, the examiner conducted a mental Residual Functional Capacity ("RFC") assessment of Hoffman and concluded that she had a moderate limitation in both the ability to maintain attention and concentration for extended periods of time, and the ability to respond appropriately to changes in the work setting. (R. 358-59.) In the narrative portion of the RFC assessment, the examiner indicated that Hoffman "can follow some detailed instructions, but she needs a single repetitive work setting to help her stay focused on tasks." He also noted that Hoffman "adjusts slowly to changes" and "needs a job with few changes in daily routine. Within noted limits she has the behavioral capacity to do two to four step tasks." (R. 360.)

Another non-examining state agency physician conducted a physical RFC assessment of Hoffman on October 18, 1999. (R. 362-69.) That examiner found Hoffman unable to climb

ladders, ropes, or scaffolds, but otherwise capable of performing "light work."[15] (R. 363-64.) In reaching this conclusion, the examiner stated that (1) Hoffman was noncompliant with office visits and medication; (2) it "appear[ed] to many ER visit doctors that [she] uses back pain as a means to get narcotics medication"; and (3) Hoffman had a normal neurological evaluation on April 6, 1999. (R. 369.)

## B.    Hoffman's Testimony

Hoffman testified that she is unable to work because of her headaches and lower back and leg pain. (R. 42.) She stated that the headaches began approximately six months after an August 1997 car accident and have gradually worsened over time. (*Id.*) Though Hoffman gets headaches every day, she characterized a "good day" as one when she does not wake up with a headache and can start taking Depakote without first taking headache pain medication. According to Hoffman, she has two such "good days" per week. (R. 43.) On those "good days," Hoffman goes shopping and is able to drive, garden, walk the dog, and do laundry "to a certain extent." She also takes her nephews to the pool and watches them swim. Nevertheless, Hoffman can only sustain activity for an hour or two and still lies down nearly every day "for a little while." (R. 48.) On "bad days," Hoffman wakes up with a headache and has to lie in bed with ice on her head, the lights off, and no sound for one to six hours. (R. 45-46.)

Hoffman's various medications make her feel drowsy and unable to concentrate. (R. 46.) She testified that the lower back and leg pain is brought on by lifting objects, turning or bending the "wrong way," walking a lot, and standing for any length of time. (R. 49-50.) Prior to July 2000, Hoffman was able to walk a couple of blocks without pain and carry up to 10 pounds. Since that

---

[15]    "Light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

date, however, she is always in pain; can only stand for two hours before her legs feel weak; and can only carry up to five pounds. (R. 50-51.) Hoffman stated that she takes Soma for the pain but does not have insurance to cover additional EMGs or MRIs. (R. 51-53.)

In addition to the back and leg pain and migraines, Hoffman also stated that she suffers from left eye twitching, hand tremors, neck pain, and pelvic pain. (R. 53.) Though the twitching is controlled by medication, Hoffman's hand tremors, which occur in the morning until the Depakote takes effect, cause her to drop things. (R. 55.) The episodes also occur during the day, but last at most 20 minutes. (*Id.*) Hoffman stated that her pelvic pain is due to cramping, and that it occurs between three and five days per month. (R. 56.) As for Hoffman's mental condition, she testified that she had to discontinue treatment for anxiety and depression due to lack of funds, but that she was taking Zanax to relieve the symptoms. (R. 57-58.)

Hoffman testified that she babysits for her two nephews every Friday night, but that the boys (ages 11 and 12) are fairly self-sufficient. (R. 59.) Hoffman told the ALJ that she cannot drink alcohol at all due to her medication; that she had not used cocaine for at least six years; and that she only takes the medication prescribed by her physicians. (R. 60.) With respect to her low Depakote levels, Hoffman stated that her doctor never discussed the matter with her aside from noting that the proper level was between 50 and 100. Hoffman stated that she was taking the dosage as prescribed by her physician. (R. 60-61.)

## C.    The ALJ's Findings

The ALJ found that Hoffman suffers from several severe impairments, including "history of migraine headaches, history of tension headaches, history of ovarian cysts and endometriosis, degenerative disk disease, and depression." (R. 24.) None of those impairments, however, met or equaled the ones listed in Appendix 1, Subpart P, Part 404 of the Social Security Regulations, even when "considered in combination." (R. 24-25.) The ALJ thus concluded that Hoffman retains

the residual functional capacity for light, unskilled work and is not disabled within the meaning of the Social Security Act. In reaching this conclusion, the ALJ noted that Hoffman's headaches are controlled by medication, and that "nothing in the record shows that [the Celebrex] is not effective" for Hoffman's back pain. (R. 25.) The ALJ also stated that Hoffman's report of debilitating cramps three to five days per month was unsupported by the record: "Clearly, if the claimant in fact experiences pelvic/abdominal problems to the extent she alleges, one would expect extensive evidence from a treating gynecologist (including a possible recommendation for surgery), but there is no such evidence." (*Id.*)

As further support for her RFC finding, the ALJ noted that Hoffman admitted to being able to function two out of seven days each week. In addition, Hoffman testified that she goes shopping, drives, gardens, performs household chores, and even babysits for her nephews every Friday night. In the ALJ's view, such activities, including the regularly scheduled babysitting, "[are] such that it is highly improbable that she is in fact debilitated by headaches five days per week (or unable to function because of other impairments)." (*Id.*) The ALJ also questioned Hoffman's credibility in several respects. First, the ALJ noted that despite Hoffman's claim that her symptoms resulted from a car accident, "there is no evidence that such an accident ever occurred." In addition, Hoffman's doctors raised questions about her drug-seeking behavior and she tested positive for barbiturates, morphine, and opiates in December 1999. Finally, though Hoffman stated that she was taking large doses of Depakote as prescribed by her doctors, only one of her blood level tests in two years reflected that the medication was within therapeutic range. (*Id.*)

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its

own analysis of whether Hoffman is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). (citation omitted).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

**B.    Analysis**

Hoffman argues that the ALJ erred in concluding that she is capable of performing light work despite her various impairments. She claims that the ALJ wrongly determined that her complaints of pain were inconsistent with a finding of disability, and neglected to make any determination regarding her mental RFC. (Pl. Mem., at 16.)[16] The Commissioner insists that the ALJ's decision is supported by substantial evidence and must be upheld. (Def. Resp., at 8.)[17]

---

[16]    Plaintiff's Memorandum in Support of Motion for Summary Judgment is cited as "Pl. Mem., at __."

[17]    Defendant's Brief in Support of Summary Judgment is cited as "Def. Resp., at __."

## 1. Hoffman's Credibility

Hoffman's primary argument is that the ALJ's "entire credibility analysis is based on illogical assumptions, misstatements of testimony, or misinterpretation of medical evidence." (Pl. Mem., at 24.) Hoffman claims that in determining that she did not suffer from debilitating pain, the ALJ failed to follow the specific requirements set forth in SSR 96-7p. Pursuant to that regulation, an ALJ must first determine whether the complaints of pain are supported by objective medical evidence. *See* SSR 96-7p, at 2; *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). If not, the ALJ must consider other factors, including: (1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

### a. Headaches

The ALJ found that Hoffman's migraine headaches – her primary complaint – are controlled with medication, and that her complaints of debilitating pain were not credible. Specifically, the ALJ did not believe that Hoffman has five "bad days" each week, given that she shops, drives to appointments or to the store, gardens, performs household chores, and babysits. The ALJ particularly noted that Hoffman has a set engagement to watch her nephews every Friday night, a routine that, in the ALJ's view, "would not be possible if the claimant truly experienced the level of pain she alleges." (R. 25.) Hoffman denies that her headaches are under control, noting that doctors constantly monitored and revised her medication regimen and even referred her to a psychiatrist in the belief that anxiety was exacerbating the condition. (Pl. Mem., at 21.)

### i.   Medical Evidence

The ALJ did not cite to any specific record evidence for her conclusion that Hoffman's headaches are "adequately dealt with by her medications." (R. 25.) The Commissioner, however, directs the court to several of Dr. Farbman's office notes as support for that proposition. The first page of notes indicates that as of November 30, 1998, Hoffman's migraines "are relieved with Soma" but that Dr. Farbman planned to increase her Depakote level "to alleviate all daily headaches." (R. 233.) A January 28, 1999 note on the same page similarly indicates that Hoffman "continues to have some tension headaches." (*Id.*) On the second page of notes, Dr. Farbman states that Hoffman complained of headaches again on October 11, 1999 and that he increased her Neurontin dosage as a result. (R. 238.) Dr. Farbman also notes that on December 29, 1999, he instructed Hoffman to report to the emergency room after she called complaining of slurred speech. (*Id.*) Hoffman was admitted to the VMH emergency room on December 31, 1999, and the admitting physician found that her symptoms were consistent with severe migraine headaches. (R. 239, 336.)

The court does not see how these records support the ALJ's conclusion that Hoffman's headaches were controlled with medication. To the contrary, Hoffman continued to complain of headaches and related symptoms notwithstanding the pain medication. Between January and October 1999, Hoffman returned to Dr. Farbman three times variously complaining of daily headaches, "constant headaches," and continuing headaches. In March 1999, Dr. Farbman stated that "the patient has very difficult [sic] to control headaches" and, thus, referred her to a specialized headache clinic. In August 1999, Dr. Farbman noted that Hoffman was still making "multiple complaints of headaches." (R. 235-37.) During a January 19, 2000 office visit, moreover, Dr. Farbman advised Hoffman to "cut down on her Esgic Plus use in order to avoid rebound

headaches."[18] (R. 239.) Nowhere in those records does Dr. Farbman suggest that Hoffman's headaches were "controlled" with medication. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) (an ALJ improperly "play[s] doctor" when she makes a medical conclusion without expert evidence).

The Commissioner notes that a consulting physician at VMH stated on December 31, 1999 that Hoffman's "current prophylactic medication works well for her and prevents most of her headaches," and that "[f]or break through headaches she takes over-the-counter medications." (R. 339.) Significantly, however, the physician also noted that Hoffman "recently started experiencing increased severity and intensity of her headaches," which at a minimum raises questions as to whether they remained under control as of the date of that examination. (*Id.*) Indeed, the basis for the consultation was Hoffman's admission to the hospital for a two to three day headache that could not be relieved with her then-current medications. (*Id.*) In addition, the fact that Hoffman reported using non-prescription medications to help relieve her symptoms is not dispositive of her pain level (Def. Resp., at 9); Hoffman was simultaneously taking a variety of prescription pain medications recommended by her physicians. *Cf. Powers*, 207 F.3d at 435 (complaints of severe pain not credible given "the absence of drugs prescribed for severe pain").

### ii.   Other Factors Relevant to Pain

The Commissioner argues that the ALJ expressed reasonable doubts as to whether Hoffman was actually complying with her drug regimen because she consistently had low levels of Depakote in her system. (Def. Resp., at 10.) None of Hoffman's treating physicians, however, suggested that her low Depakote levels reflected a lack of compliance in taking the medication. In fact, the one time Dr. Farbman actually described Hoffman's Depakote level as "subtherapeutic"

---

[18]     Esgic-Plus is a brand name for a combination of butalbital and acetaminophen, a pain reliever and relaxant used to treat tension headaches. (*See* http://www.drugs.com/cons/Esgic_Plus.html.)

was when she had reported vomiting from some antidepressant medication. (R. 238.) Contrary to the Commissioner's assertion, Hoffman's doctors never indicated that low levels of Depakote "suggest[] that [Hoffman's] pain was not as intense as she alleged." (*Id.*) Dr. Farbman never explained the significance of "subtherapeutic" levels of Depakote or their relation, if any, to Hoffman's pain. (R. 238.) As Hoffman notes, Depakote is intended for prophylaxis of migraine headaches, not a pain reliever. (Pl. Reply, at 4; http://www.depakote.com/com/ migraine/over_treated.cfm.)

The Commissioner next argues that the ALJ reasonably considered Hoffman's failure to comply with Dr. Farbman's recommendation for physical therapy to treat her headaches as evidence that they were not as severe as she alleged. (Def. Resp., at 12; R. 238.) The ALJ never mentioned this as a basis for concluding that Hoffman's pain was exaggerated or that she was not compliant with her treatment regimen. In any event, Hoffman notes that the referral was to treat her "cervicogenic headache," where "the primary contributing structural source of the headache is the cervical spine," and not her migraine headaches. (Pl. Reply, at 4 n.3; http://www.cinn.org/news/cervicogenicheadache.html.) Hoffman also cites evidence in the record that she does not have insurance and has been unable to pay for medical care in the past. (*Id.*; R. 52-53.) On this record, the court cannot say that Hoffman's failure to attend physical therapy supports the ALJ's conclusion that she does not experience severe pain.

Hoffman claims that the ALJ's analysis of her daily activities is similarly flawed and does not justify discounting her reports of pain. The ALJ found it significant that Hoffman "conceded that she goes shopping, drives to appointments or a store, babysits for her nephews (including taking them to a pool), gardens, and does household chores." (R. 25.) Hoffman's testimony makes it clear, however, that she engages in these activities only on her "good days," which occur only two out of seven days per week. (R. 43, 48.) On "bad days," Hoffman does not do anything but lie in bed for one to six hours with ice on her head and all lights and sounds turned off. (R. 45-46.) The

21

ALJ acknowledged Hoffman's testimony regarding her "good day" and "bad day" activities (R. 24), but she did not explain how Hoffman's ability to shop, drive, and garden on "good days" renders it "highly improbable" that she has debilitating headaches on her five "bad days." (R. 25.) *See, e.g., McCarty v. Barnhart*, 85 Fed.Appx. 528, 2004 WL 60286 (7th Cir. 2004) ("minimal activities" such as household chores, driving, attending church, sewing, and using a computer "are not sufficient to contradict subjective complaints of disabling pain").

Hoffman's ability to babysit for her two nephews every Friday night does raise some question as to the extent and regularity of her pain. (*Id.*) Nevertheless, in questioning Hoffman during the hearing, the ALJ herself stated that at ages 11 and 12, the boys were largely self-sufficient:

| | |
|---|---|
| Q: | Did you mention that you baby-sit your nephews? |
| A: | Well, if that's what you call it. I watch them every Friday evening. |
| Q: | All right. |
| A: | It's my sister's one night of freedom. |
| Q: | How many do you have? |
| A: | She has – I watch two of her boys. They're 10 and 11, or actually no, 11 and 12. They just had a birthday. |
| Q: | So they're fairly self-sufficient I would assume? |
| A: | Yes. |

(R. 59.) The ALJ did not ask Hoffman whether she ever has to lie down due to migraine pain while watching her nephews. Nor did she articulate how one night of babysitting "fairly self-sufficient" boys each week is inconsistent with complaints of debilitating pain five days per week. (R. 59.) *See McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004) ("[t]he ALJ need not address every single piece of evidence in his decision, . . . but his analysis must build an accurate and logical bridge between the evidence and his findings").

The Commissioner argues that the ALJ's concerns about Hoffman's credibility were well-founded because, as the ALJ pointed out, several physicians suspected that Hoffman was engaging in drug-seeking behavior. (Def. Resp., at 9.) Three VMH emergency room physicians raised this possibility, noting as follows: (1) "? drug seeking" on March 3, 1998; (2) "suspect drug

seeking behavior" on March 29, 1998; and (3) "appearance of drug seeking behavior" on January 2, 1999. (R. 181, 189, 286, 369) (emphasis in original). None of these ER visits was for migraine pain, however, and none of Hoffman's treating physicians noted similar behavior. In addition, her medical records after January 1999 never mention drug-seeking concerns. The ALJ found it significant, however, that in December 1999 Hoffman tested positive for barbiturates, morphine, and opiates, "which is not consistent with what she was prescribed." (R. 25.) Hoffman insists that the ALJ erred in considering such evidence without also addressing the following disclaimer printed on the test results: "Chain of Custody: NO. Specimen analysis was performed without chain of custody handling. These results should be used for medical purposes only and not for any legal or employment evaluative purposes." (Pl. Mem., at 22; Pl. Reply, at 3.) Hoffman also claims, without supporting citation, that "Plaintiff's prescribed medications may have given positive results on such a test." (Pl. Reply, at 3.)

The court agrees that the ALJ properly considered Hoffman's positive drug test in assessing her credibility. *See* 20 C.F.R. § 404.1527(a)(2). At the same time, that positive test result does not alone support the conclusion that Hoffman's complaints of pain were exaggerated or not credible. As noted, the medical records from Hoffman's treating physicians all indicate that she continued to complain of daily and/or constant headaches, and none of the physicians stated that the headaches were "controlled" with medication. *See Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001) ("where the medical signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations"). In light of this medical evidence, the fact that Hoffman had other drugs in her system on one occasion does not disprove that she was experiencing debilitating headache pain at that time.

The state agency physician's opinion that "Plaintiff was engaging in drug seeking behavior" does not change this analysis or resolve the court's concerns. (Def. Resp., at 10; R. 369.) The sole bases for that conclusion were the opinions of the three emergency room physicians already

23

mentioned. (R. 369.) Moreover, the state agency physician stated that the appearance of drug-seeking behavior related to Hoffman's back pain, not her headaches. (*Id.*) ("appears to many ER visit doctors that patient uses back pain as a means to get narcotics medication"). The court concludes that the ALJ's credibility determination as to Hoffman's migraine pain is not supported by the record. *See Powers*, 207 F.3d at 435.

### b. Back Pain

Hoffman next challenges the ALJ's dismissal of her complaints of back pain. The ALJ acknowledged that Hoffman has degenerative disk disease, but found that "Dr. Farbman has put her on Celebrex for back pain, and nothing in the record shows that this medication is not effective." (Pl. Mem., at 25; R. 25.) The ALJ addressed most of Hoffman's medical records on this issue, noting that she was first treated for "a work-related injury resulting in a herniated disk at L5/S1 with diskogenic type pain." (R. 22.) Hoffman went to the ER several times thereafter complaining of back pain and on December 20, 1999, underwent a cervical MRI which showed mild diffuse bulging of the intervertebral disk at C5-C6. (R. 22-23, 374.) A December 21, 1999 lumbar spine MRI showed evidence of a small to moderate left forminal disc protrusion at L3-L4, and laminectomy defect on the right at L5-S1 with "[e]vidence of enhancing post-surgical scar ventral to the thecal sac at L5-S1 and to some degree likely entrapping the right S1 nerve root which is minimally displaced posteriorly." (R. 23, 372-73.) The MRI also indicated that "[a] residual diffuse mild degenerative bulging disc at L5-S1 is present." (R. 23, 373.) Hoffman had another MRI of the lumbar spine on April 6, 2000 which showed a small protrusion of the disc at L5 and L5-S1; moderate disc degeneration at L5 and S1; and degenerative arthritis of the facet joint at L4-5 and L5-S1. (R. 23, 409.) July 2000 X-rays of the lumber spine, however, were normal. (R. 23.)

Hoffman claims that the Celebrex prescription she received from Dr. Farbman in April 2000 does not establish that her back pain was resolved, noting that Dr. Milejczyk subsequently

prescribed Vioxx for the same condition in June 2000. (Pl. Mem., at 26.) To the extent Celebrex and Vioxx are both used to manage osteoarthritis pain, the additional prescription is arguably evidence that Hoffman's pain was not sufficiently controlled with Celebrex. (R. 417.) In any event, Hoffman testified that her lower back and leg pain is brought on by lifting objects, turning or bending the "wrong way," walking a lot, and standing for any length of time. (R. 49-50.) Since July 2000, Hoffman says, she is always in pain; she can only stand for two hours before her legs feel weak; and she can only carry up to five pounds. (R. 50-51.) Hoffman testified, however, that on "good days" when she does not wake up with a headache, she is able to shop, garden, drive, walk the dog, and take her nephews to the pool. She might have to lie down one time for "a little while" on such days, but not due to her back pain. (R. 48.) In light of this testimony, the ALJ's rejection of Hoffman's complaints of debilitating back pain was not patently wrong. *Powers*, 207 F.3d at 435.

Hoffman claims that the ALJ should not have relied on the state agency physician's conclusion that she is capable of performing light work because the examiner did not have her most recent MRI results from December 1999 and April 2000, records relating to her admission to the hospital in December 1999 for a migraine episode, or "numerous alterations in Plaintiff's medication regimen." (Pl. Mem., at 29; R. 24, 25, 363-64.) The ALJ did consider the MRI test results, migraine episode, and medication changes, however, and reasonably concluded that, in light of Hoffman's testimony regarding her activities on non-migraine days, they did not support a finding of disability from back pain. (R. 22-25.)

The parties finally dispute the significance of the ALJ's discussion of Hoffman's 1991 car accident. Specifically, the ALJ found Hoffman's credibility to be "at issue" in part because

> [s]he states that her symptoms are the result of a motor vehicle accident [but] there is no evidence that such an accident ever occurred. She first applied for benefits based on pelvic/abdominal problems and did not even raise issues about a motor vehicle accident that supposedly occurred before the filing of that application.

(R. 25.) Hoffman submits police reports and insurance records relating to the accident and argues that "[i]f the ALJ felt that the issue of the accident needed more development, i.e., whether it occurred or not or whether the impairments were related to the accident or not, the ALJ should have developed the record." (Pl. Mem., at 21) (citing *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000)) ("[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits"). The Commissioner claims that the ALJ reasonably considered the absence of any medical records "at the time of the car accident, despite Plaintiff's contention that this car accident caused her disabling condition." (Def. Resp., at 16.)

The court disagrees with the ALJ's conclusion that Hoffman lacked credibility based on her failure to submit proof of the car accident or medical records establishing that the accident caused her impairments. Regardless of the initial cause of Hoffman's conditions, the medical records clearly evidence that they exist. Even assuming Hoffman's impairments did not result from the accident, it is not clear how that would undermine her complaints of pain. In any event, this error is harmless to the extent it was not the sole basis for the ALJ's credibility determination, which the court affirms.

### c. Stomach Pain

Hoffman next objects that the ALJ improperly dismissed her complaints of pain and cramping in her lower abdominal and pelvic region. The medical evidence disclosed that Hoffman has a history of ovarian cysts and endometriosis, dating back to January 26, 1998. (R. 171-72, 175, 272-73.) Hoffman had ultrasounds in January and February 1998 which both showed an enlarged left ovary. She was unable to pursue treatment "[d]ue to lack of insurance and money" and started taking Vicodin instead. (R. 175, 205.) In March 1998, Hoffman was again diagnosed with ovarian cysts and was newly diagnosed with endometriosis. (R. 282, 391.) A March 13, 1998 ultrasound was normal, as was an air contrast colon exam. (R. 197, 183.) A March 26, 1998 air

contrast upper gastrointestinal exam, however, showed evidence of "a gastric ulcer in the antrum with some associated thickening of the folds in the antrum." (R. 187.) The exam also showed evidence of duodenitis. (*Id.*) On March 29, 1998, an emergency room physician diagnosed Hoffman with trichomonas and chronic abdominal and pelvic pain. (R. 189.)

In April 1998, Dr. Wise, a gynecologist, considered a "possible referral to pain clinic" for Hoffman. (R. 204.) An April 30, 1998 ultrasound of the gallbladder was normal (R. 284), but a June 23, 1998 air contrast upper GI series exam indicated "some thickening of the duodenal folds suggestive of some possible mild diffuse duodenitis." (R. 264.) An MRI of the cervical spine and an ultrasound of the pelvis performed on June 25, 1998 were both normal. (R. 225, 266.) Hoffman's next and final complaint of abdominal pain was more than a year later on August 14, 1999. (R. 314-15.) Abdominal X-rays taken at that time were normal but a pelvic ultrasound showed what "appear[ed]" to be a cyst on the left ovary. (R. 318-19.)

The ALJ considered this medical evidence but did not credit Hoffman's complaints of "daily cramps (which she alleges are debilitating three to five days per month)." (R. 25.) In the ALJ's view, "if the claimant in fact experiences pelvic/abdominal problems to the extent she alleges, one would expect extensive evidence from a treating gynecologist (including a possible recommendation for surgery), but there is no such evidence." (*Id.*) Hoffman suggests that there are no records from a treating gynecologist because "she has difficulty paying for consistent medical treatment." (Pl. Mem., at 26.) She claims that she was scheduled for surgery in March 1998 but that the doctor had canceled the procedure (R. 177), and at least one physician, Dr. Sun, did decline to treat Hoffman after March 1998 due to lack of insurance. Nevertheless, there is no evidence that other physicians, including Dr. Wise, declined to treat Hoffman for similar reasons. Indeed, Hoffman only once sought medical attention for stomach pain between June 25, 1998 and the date of the hearing, but she repeatedly saw treating and emergency room physicians for other

conditions during that time period, including Dr. Palu-Ay, Dr. Farbman, and Dr. Milejczyk. The ALJ did not err in rejecting Hoffman's complaints of debilitating pain from abdominal cramps.

### d.    Additional Conditions

In addition to the headaches, back pain, and stomach pain, Hoffman alleges that the ALJ should have considered her obesity, history of additional migraine symptoms, tremors, dizziness, and side effects from medication in assessing her testimony regarding pain. (Pl. Mem., at 27.) The court finds no error in the ALJ's handling of these complaints.

Hoffman did not address her obesity either in her application for benefits or at the hearing before the ALJ, but she now contends that the ALJ should have considered whether the condition is a factor in her disability assessment. SSR 00-3p, *superseded without substantive change by* SSR 02-01p (requiring ALJ to consider obesity at various points of the five-step analysis). Dr. Maruf specifically diagnosed Hoffman as obese on July 2, 1999, and Dr. Palu-Ay and Dr. Milejczyk both noted the condition in several of her medical records. (R. 286, 381, 383, 389, 397, 415, 416.) This was sufficient to put the ALJ on notice of the condition. *See Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000) (ALJ should have been alerted to claimant's obesity based on "numerous references in the record to [her] 'excessive' weight problem"). Hoffman argues that her obesity "is relevant for Plaintiff's complaints of back pain" and "may have been a complicating factor in obtaining the correct dosage for Depakote." (Pl. Mem., at 27.) None of Hoffman's physicians, however, indicated that her obesity was a factor in either regard. Nor did Hoffman herself testify that her weight contributed to her back pain in any way. The ALJ followed the limitations recommended by the state agency physician in determining Hoffman's ability to work and did not err in failing to specifically mention Hoffman's obesity in assessing her complaints of pain.

Hoffman next argues that the ALJ "omitted any meaningful analysis of" her dizzy spells or her history of sonophobia, photophobia, nausea, and slurred speech, which are all associated with

her migraine headaches. In fact, the ALJ did cite Hoffman's testimony that she experiences dizzy spells on her "bad days" and even noted that she has had blackouts. (R. 24.) Given the ALJ's extensive review of Hoffman's migraines generally, she did not err in failing to mention every single related symptom. *Indoranto*, 374 F.3d at 474 ("the ALJ need not discuss every piece of evidence in the record"). Significantly, though Hoffman complains of a history of sonophobia, photophobia, nausea, and slurred speech, there is no evidence that she continues to experience these symptoms on a regular basis.

Hoffman finally argues that the ALJ should have discussed the side effects of her various medications. (Pl. Mem., at 27.) Hoffman is correct that pursuant to SSR 96-7p, one factor to consider in assessing pain is "the type, dosage, side effects, and effectiveness of medication" taken to alleviate pain or other symptoms. *Stevenson v. Apfel*, 202 F.3d 275 (Table) (7th Cir. 1999). An ALJ need not, however, discuss every factor listed in SSR 96-7p; "[t]o the contrary, we have upheld an ALJ's evaluation of symptoms where the ALJ relied on only a few of the factors listed." *Id.* Hoffman's treating physicians did not indicate that she had any problematic side effects from her medications and the ALJ discussed the other relevant factors in assessing Hoffman's complaints of pain. The court finds no error.

In sum, the ALJ's credibility determinations regarding Hoffman's migraine headaches and her 1997 traffic accident are not supported by the record, but in all other respects, they are supported by substantial evidence.

## 2.    The RFC Determinations

Having determined that the ALJ was patently wrong in her assessment of Hoffman's credibility as it relates to her migraines, the court next considers whether that failure resulted in an improper RFC determination. The ALJ found that Hoffman is capable of performing the full range of light, unskilled work but cannot perform her past relevant work as a cashier or waitress because

"that work was semi-skilled in nature." (R. 25.) The ALJ also found that Hoffman "can lift and carry 20 pounds occasionally and 10 pounds frequently and sit, stand or walk as required in a job that does not require complex or detailed tasks." (*Id.*) Finally, the ALJ stated that Hoffman "has depression, but the claimant's mental functional limitations are a moderate restriction of activities of daily living; slight difficulties in maintaining social functioning; moderate limitations in concentration, persistence or pace; and one or two episodes of decompensation." (*Id.*) Hoffman insists that none of these determinations is supported by substantial evidence.

   a.    **The Physical RFC Determination**

   Hoffman claims that the RFC for the full range of light work is "internally inconsistent" because the ALJ found her incapable of working as a waitress or cashier, but both of those jobs are considered light work. (Pl. Mem., at 28) (citing THE DICTIONARY OF OCCUPATIONAL TITLES, at 311.477-030, 211.462-014.) The ALJ explained this finding, however, by noting that waitress and cashier work is "semi-skilled" but that Hoffman can perform only unskilled work. (R. 25.) Hoffman next urges that the ALJ erred in relying on the state agency physician's RFC which, she says, "was based upon what the reviewer believed was non-compliance with office visits and medications and drug-seeking behavior." (Pl. Mem., at 28) (citing R. 369.) The examiner did note that several ER physicians suspected Hoffman of drug-seeking behavior; that she was non-compliant with medications; and that she had normal sensation, strength, and reflexes in her back as of April 6, 1999. There was evidence in Hoffman's medical records, however, to support all of these statements.

   Hoffman nonetheless argues that it was error for the ALJ to rely on an RFC assessment by a non-treating, non-examining physician. (Pl. Mem., at 29) (citing *Allen v. Weinberger*, 552 F.2d 781, 786 (7th Cir. 1977)). The court disagrees. First, *Allen* does not hold that an ALJ should never rely on the opinions of non-examining physicians; indeed, this would be contrary to 20 C.F.R. §§

416.927(d) and 404.1527(d) (stating that all medical evidence, which includes opinions of treating and non-treating physicians, will be evaluated). In addition, the claimant's treating physician in *Allen* repeatedly opined that he was disabled, whereas none of Hoffman's treating physicians suggested that she is disabled or incapable of performing light work. 552 F.2d at 786. *See also Ross v. Shalala*, 47 F.3d 1173 (Table) (7th Cir. 1995) (ALJ properly relied on RFC assessments by non-treating physicians where the only contrary evidence from a treating physician consisted of a "sketchy letter" stating that the claimant was completely disabled).

More problematic is the fact that the examiner appears to have limited his evaluation to Hoffman's back pain without mentioning her migraines or their effect, if any, on her ability to work. (R. 369.) As explained earlier, the ALJ erred in dismissing Hoffman's complaints of debilitating migraine pain. The ALJ similarly failed to explain how that migraine pain, which Hoffman claims to experience five days per week, is consistent with a finding that Hoffman can sustain full-time employment. *See, e.g., Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004) (ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"; claimant's ability to drive, shop, and do housework for a little while when not feeling as much pain did not mean she could "maintain concentration and effort over the full course of the work week"). Thus, the physical RFC is not supported by substantial evidence.

### b. The Mental RFC Determination

Hoffman finally claims that the ALJ erred with respect to the mental RFC determination. The ALJ found that Hoffman "has depression, but the claimant's mental functional limitations are a moderate restriction of activities of daily living; slight difficulties in maintaining social functioning; moderate limitations in concentration, persistence or pace; and one or two episodes of decompensation." (R. 25.) Hoffman argues that this assessment conflicts with the only mental

RFC evaluation in the record, which the ALJ does not even cite. Specifically, the state examiner found that Hoffman has a slight limitation in her activities of daily living (R. 356), but the ALJ found Hoffman to be moderately restricted in that regard. (R. 25.) In addition, the state examiner found insufficient evidence regarding episodes of decompensation (R. 356), but the ALJ found one or two such episodes. (R. 25.) To the extent the ALJ found Hoffman to be *more* restricted than the examiner, however, the court does not see how Hoffman has any basis for complaint.

Hoffman's treating psychiatrist, Dr. Perakis, found that she was guarded, anxious, and depressed, but that her concentration was good and her memory was intact. (R. 325.) He found "no evidence of any formal thought disorder or of any active perceptual defects," and treated her depression with Serzone, which she tolerated with no side effects. (R. 328.) Consistent with this evaluation, the ALJ determined that Hoffman suffers from depression, a severe impairment. The ALJ did not specifically refer to the state examiner's RFC, but she did find Hoffman unable to perform work requiring complex or detailed tasks, which are limitations expressly noted by the examiner. (R. 360.)

Hoffman claims that given the state examiner's finding that she is "moderately" and "often" limited in concentration and in the ability to adapt to change, she is not capable of substantial gainful employment. (Pl. Mem., at 33.) In Hoffman's view, a "moderate" limitation equates to "an impairment of approximately 50% of functional limitation." (*Id.*) (citing *Morris v. Barnhart*, No. 01-74410, 2002 U.S. Dist. LEXIS 16933, at *36-37 (E.D. Mich. July 31, 2002) (citing *Bankston v. Commissioner of Social Security*, 127 F. Supp. 2d 820 (E.D. Mich. 2000) for the proposition that "'often' should logically be defined as fifty percent of the time"). This court is not bound by these decisions, however, and as the Commissioner notes, the state examiner went on to explain that notwithstanding the stated limitations, Hoffman is capable of performing four step tasks in a repetitive work environment with few changes to her daily routine. (R. 360.) *Compare Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) ("[b]oth Dr. Matkom and Dr. Berney found that

32

Johansen was essentially 'moderately limited' in his ability to maintain a regular schedule and attendance, and in his ability to complete a normal workday and workweek without interruption from psychologically-based symptoms. Dr. Matkom, however, went further and translated those findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work").

Nevertheless, given the court's conclusion that Hoffman's physical RFC must be re-evaluated in light of her migraine headaches and related complaints of debilitating pain, the ALJ should also reconsider and explain whether the migraine pain affects Hoffman's ability to concentrate throughout a full work week. Hoffman urges that the ALJ should be required to consult with a vocational expert ("VE") in reaching this conclusion rather than relying solely on the Medical-Vocational Guidelines ("the Grids"), 20 C.F.R. § 404 Subpart P, Appendix 2. (Pl. Mem., at 31.) The Seventh Circuit has clearly stated that "where a nonexertional limitation [such as pain] might substantially reduce a range of work an individual can perform, the use of the grids would be inappropriate and the ALJ must consult a vocational expert." *Zurawski*, 245 F.3d at 889. Because the court has ordered a redetermination of Hoffman's residual functional capacity and a reevaluation of her testimony, however, "it would be premature to direct the ALJ to solicit vocational testimony from an expert. That said, . . . the ALJ must act consistent with the law in this circuit . . . if she relies on the grids on remand." *Id.* at 889-90.

## CONCLUSION

For the reasons stated above, the case is remanded to the ALJ for further proceedings consistent with this opinion. On remand, the ALJ should reevaluate Hoffman's complaints of

debilitating migraine pain and the effect it has, if any, on the ALJ's physical and mental RFC determinations. The ALJ should also elaborate on her RFC assessments and explain why Hoffman is capable of performing full-time light work despite her migraines and other impairments.

ENTER:

Dated: January 12, 2005

REBECCA R. PALLMEYER
United States District Judge